**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

CHINOWTH & COHEN, LLC,   )
            )
    Plaintiff,   )
            )  Case No. 15-CV-555-JED-TLW
v.          )
            )
CORNERSTONE HOME LENDING, INC.,)
            )
    Defendant.  )

**<u>OPINION AND ORDER</u>**

**I.  Background**

   The following facts are either undisputed or are supported by evidence in the summary judgment record and taken as true, with all reasonable inferences drawn in favor of the plaintiff, as is required at the summary judgment stage.

   The plaintiff, Chinowth & Cohen, LLC (C&C) is engaged in the business of real estate sales in Tulsa and surrounding communities.  The defendant, Cornerstone Home Lending, Inc. (Cornerstone) is a home mortgage lender licensed in 37 states.  C&C and Cornerstone entered into a Marketing and Services and Office Facilities Agreement (MSA) dated December 13, 2013. Among other things, the MSA required C&C to designate Cornerstone as a preferred lender of choice in connection with residential mortgage loans and to provide certain marketing services, goods, and facilities.  The MSA required C&C to provide Cornerstone office space with utilities and furniture, telephone and internet access, and shared access to areas of the C&C offices, such as kitchen, conference rooms, and restrooms.  The agreement set forth a rental fee formula per square foot, to be paid by Cornerstone, with respect to the designated spaces in each of C&C's offices.  The marketing services to be provided were identified on Exhibit A to the MSA, and

included ten categories of services that C&C was to provide. The parties agreed that Cornerstone would pay C&C a bundled monthly sum of $10,000 in exchange for those marketing services.

It is undisputed that Cornerstone terminated the MSA effective December 31, 2014. However, Cornerstone continued to occupy C&C's offices through June of 2015.  Brian Bomar, who was at the time the Senior Vice President / Area Manager for Cornerstone, frequently dealt directly with C&C regarding administration of the MSA on behalf of Cornerstone.  Bomar notified C&C of the termination of the MSA before it was terminated, and, subsequent to the termination of the MSA, Mr. Bomar continued to engage in business discussions with C&C while Cornerstone occupied C&C offices.  At deposition, Mr. Bomar testified that, after the termination of the MSA, C&C and Cornerstone "agreed to continue to have a relationship . . . [a]nd the discussion for an ongoing relationship was because of the potential to grow the organization and turn that into a joint venture in the future."  (Doc. 38 at 42-43 [Dep. pp. 94-95]).  Mr. Bomar also testified that "it is possible" that there were discussions with C&C about continuing some or all of the marketing services identified on Exhibit A to the MSA.  (*Id.* at 43-44 [Dep. pp. 95-96]).

Bomar further admitted that, after termination of the MSA, C&C continued to perform at least some of the marketing services listed in the MSA, including three of the ten categories of services identified on Exhibit A to the MSA:

> "Allow mortgage company sales professionals access to [C&C's] sales offices, employees and agents, participation in [C&C's] internal sales meetings, award ceremonies and celebrations, and training of [C&C's] employees and agents regarding [Cornerstone's] products and services."  (*See id.* at 44-45 [Dep. pp. 96-97]); *see also* Doc. 31 at 24 [Exhibit A]).

> "Display [Cornerstone's] marketing materials and signage at [C&C's] sales offices, listings and other locations, as applicable."  (Doc. 38 at 46 [Dep. p. 100]; Doc. 31 at 24).

"Include [Cornerstone's] banner advertisement or marketing information and/or link to [Cornerstone's] web site on [C&C's] web site(s)."  (Doc. 38 at 46 [Dep. p. 100]; Doc. 31 at 24).

Bomar also agreed that a fourth category of identified marketing services may also have continued beyond the termination of the MSA: "Grant [Cornerstone] a license to use [C&C's] name and/or logo and/or trademark to identify [Cornerstone] as a preferred lender of [C&C] in [Cornerstone] marketing materials." (Doc. 38 at 46-47 [Dep. pp. 100-101]).  After termination of the MSA, Mr. Bomar also asked C&C to introduce a Cornerstone employee to C&C agents and employees, which he recognized was the "same thing that [he] asked [C&C] to do during the term of the MSA." (Doc. 38 at 49 [Dep. p. 103]; *see also id.* at 98).  Bomar further stated that, for at least three months after termination of the MSA, C&C was allowing Cornerstone employees to make presentations to C&C real estate agents. (*Id.* at 50 [Dep. p. 104]).

Notwithstanding Bomar's testimony, Cornerstone denies that C&C continued to provide any marketing services after termination of the MSA.  Cornerstone did not pay for any such services, but at the time the relationship between Cornerstone and C&C ended in June 2015, Cornerstone tendered a check for $16,249.98, which it represented was to cover six months of "rent" through June 2015.  (*See* Doc. 31 at 86, 88, 90; *see also* Doc. 46 at 7, fn. 2; Doc. 47 at 23 [where Cornerstone represents in its reply brief that it is "again tendering rental payment to Plaintiff in connection with this Motion"]).  C&C did not accept the tendered payment, as C&C considered it an attempt to obtain a release of other amounts which C&C alleges are owed for marketing services it provided after the MSA was terminated.  (*See* Doc. 37 at 4; *see also* Doc. 31 at 86 [Cornerstone's tender of check only for "payment of rent" as inclusive of "the reasonable value of any services actually tendered subsequent to termination of the [MSA]."]).

After the parties' relationship ended, C&C filed suit in Tulsa County District Court, alleging that, after the termination of the MSA, the parties entered into a new agreement for the continuation of marketing services on a month-to-month basis.  Cornerstone removed the action to this Court based upon diversity jurisdiction, as C&C alleged in its Petition that it is owed $76,698.00, plus prejudgment interest, costs, and fees.  C&C asserts claims against Cornerstone for breach of contract, quantum meruit, and unjust enrichment.  (Doc. 2-1).

Cornerstone moves for summary judgment, asserting that: Bomar had no authority on behalf of Cornerstone to engage in a new business arrangement with C&C; C&C did not provide any marketing services after the termination of the MSA; there was no contract beyond the MSA; C&C is owed only an amount for rent for six months; and C&C has no evidence supporting its quasi-contract claims.  In response, C&C argues that there was an oral or implied agreement that C&C would continue to provide marketing services and office space for compensation or, alternatively, C&C has provided evidence supporting a quasi-contract claim for quantum meruit.

## II.     Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor.  *Id.*

at 255.  The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant.  *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

## III.   Discussion

Upon consideration of the parties' briefs and the applicable law, the Court concludes that there are genuine disputes of material fact that prevent the entry of summary judgment.  Material issues for the jury include (but are not necessarily limited to) the following: (1) whether Brian Bomar had apparent authority to act on behalf of Cornerstone in negotiating and continuing a business relationship with C&C after the termination of the MSA; (2) whether the parties had a contract which included an agreement that Cornerstone would compensate C&C for the value of providing continued marketing services and office space after the MSA was terminated; (3) even if there was no contract, whether C&C's provision of office space and alleged marketing services to Cornerstone following termination of the MSA entitles C&C to recover under a quasi-contract claim such as quantum meruit / unjust enrichment; and (4) if a jury finds in favor of the plaintiff on a contract or quasi-contract claim, what is the proper amount of damages, if any.

The evidence, construed in favor of C&C, supports its claim that Mr. Bomar had at least apparent authority to enter into a new business agreement by which Cornerstone would pay for the value of the services and space provided by C&C.  Under Oklahoma law, which the parties agree applies to this diversity case, the existence of actual authority is not a prerequisite to establishing apparent authority.  *Stephens v. Yamaha Motor Co.*, 627 P.2d 439, 441 (Okla. 1981).  Instead, apparent authority results from a manifestation by the principal to a third party that another is his agent.  *Id.*  "[A]pparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized."  *Id.* (quoting Restatement (Second)

of Agency, § 8, cmt. C).   Under Oklahoma law, "[t]he apparent authority of an agent is to be gathered from all the facts and circumstances and evidence and is a question of fact for the jury, and the evidence of authority of the agent may be proved by the circumstances, but not by the declaration of the agent." *Reed v. Anderson*, 259 P. 855, 856 (Okla. 1927); *see also Bridgeport Firemen's Sick & Death Ben. Ass'n v. Deseret Fed. Sav. & Loan Ass'n*, 735 F.2d 383, 388 (10th Cir. 1984) ("[T]he question of apparent authority is usually considered a question of fact.").

C&C has presented evidence that Bomar: had the authority to negotiate leases on behalf of Cornerstone; was involved in the negotiations of the MSA with C&C; administered performance of the MSA on a day-to-day basis; provided C&C advance notice of the termination of the MSA; discussed with C&C the continued business relationship after the termination of the MSA; asked C&C to make introductions of other Cornerstone employees to C&C real estate agents; knew that Cornerstone continued to occupy offices and conduct marketing meetings at C&C for months after termination of the MSA; and had the title of Senior Vice President / Area Manager in the relevant time-frame.   This evidence precludes summary judgment on the issue of whether or not he had authority to act on behalf of Cornerstone.

The summary judgment record contains sufficient evidence to support C&C's assertion that, following the termination of the MSA, C&C continued to perform marketing services benefitting Cornerstone, pursuant to an agreement with (or at least the understanding of) Mr. Bomar, and it is undisputed that C&C continued to provide office space to Cornerstone for a period of six months.   It is also undisputed that Cornerstone paid nothing for those services or office space, with the exception of tendering payment, for rent alone, approximately six months after the termination of the MSA.   A reasonable jury could find from this evidence that there was an agreement or, if there was not an agreement, Cornerstone received a benefit from C&C for which

6

C&C should be compensated pursuant to a quasi-contract theory. *See Okla. Stat.* tit. 15, §§ 131-134 (oral or implied contracts); *Dixon v. Bhuiyan*, 10 P.3d 888, 891 (Okla. 2000) (discussing implied contracts); *Piggee v. Mercy Hosp.*, 186 P.2d 817, 819 (Okla. 1947) (discussing measure of damages in quasi-contract context); *see also Fischer Imaging Corp. v. Gen. Elec. Co.*, 187 F.3d 1165, 1172 (10th Cir. 1999) ("Generally, in quasi-contract actions, courts have submitted the question of the value of the goods or services to the jury").

## IV.    Conclusion

For the foregoing reasons, Cornerstone's motion for summary judgment (Doc. 30) is **denied**.

SO ORDERED this 4th day of April, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE